# EXHIBIT 3

Trial Transcript, Vol. 6 (September 29, 2026) (excerpts)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SAHAI, | ) 5:24-CV-07791-NC |
| PLAINTIFF, | ) SAN JOSE, CALIFORNIA |
| VS. | ) SEPTEMBER 29, 2026 |
| LINCOLN FINANCIAL GROUP, INC., ET AL. | ) VOLUME 6 |
| | ) PAGES 790 - 1037 |
| DEFENDANT. | ) |

TRANSCRIPT OF CIVIL JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE NATHANAEL M. COUSINS
UNITED STATES CHIEF MAGISTRATE JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF: HEPURN, HERNANDEZ & JUNG
2175 SALK AVENUE, SUITE 180
CARLSBAD, CA 92008
**BY: MICHAEL PATRICK HERNANDEZ**

FOR THE DEFENDANT: MAYNARD NEXSEN PC
2121 AVENUE OF THE STARS, SUITE 650
LOS ANGELES, CA 90067
**BY: ROBERT EDWARD HESS**

(APPEARANCES CONTINUED ON THE FOLLOWING PAGE.)

OFFICIAL COURT REPORTER: TIFFANY SALINAS-HARWELL, RPR
CERTIFICATE NUMBER 971863

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED WITH COMPUTER

A P P E A R A N C E S: (CONTINUED.)

FOR THE PLAINTIFF: DAWSON & ROSENTHAL, PC
421 W. BROADWAY, UNIT 380
SAN DIEGO, CA 92101
**BY: AARON M. DAWSON**

FOR THE PLAINTIFF: DAWSON & ROSENTHAL, PC
421 W. BROADWAY, UNIT 380
SAN DIEGO, CA 92101
**BY: GARY TRAYLOR**

FOR THE DEFENDANT: MAYNARD NEXSEN PC
1901 6TH AVENUE NORTH, SUITE 1700
BIRMINGHAM, AL 35203
**BY: MICHAEL DOUGLAS MULVANEY**

FOR THE DEFENDANT: MAYNARD NEXSEN LLP
201 CALIFORNIA STREET, SUITE 400
SAN FRANCISCO, CA 94111
**BY: CHARAN M. HIGBEE**

ALSO PRESENT: **PAULA MCGEE, LINCOLN VP AND SENIOR COUNSEL**

**ERIC DUNBAR, TRIAL TECHNICIAN**

THAT WAS BASED ON WHAT HE SAW AT THE TIME, BUT ALSO THE EXPECTATION THAT SHE WAS STILL BEING EVALUATED BY SPECIALISTS TRYING TO FIGURE OUT WHAT WAS GOING ON, AND HE RECOMMENDED FOLLOWING UP VERY CLOSELY TO CONTINUE TO DEVELOP THE FILE AND BETTER UNDERSTAND WHAT WAS GOING ON.

**Q.** I WANT TO MOVE ON FROM THE SPECIFIC CLAIM FILE REVIEW AND TALK ABOUT A COUPLE OF OTHER THINGS WITH YOU QUICKLY, MR. SCHAAPVELD.

AGAIN, THERE'S BEEN DISCUSSION IN THE TRANSCRIPT ABOUT MS. BORBOA'S HANDLING OF THE CLAIM FILE, THE CLAIMS EXAMINATION PROCESS THE JURY HAS SEEN, AND THE METRICS, GOALS, AND STANDARDS WE TALKED ABOUT EARLIER, AS WELL AS HER OWN PERFORMANCE EVALUATIONS. BEFORE WE TALK ABOUT THE STANDARDS AND GOALS, I WANTED TO ASK YOU ONE SPECIFIC QUESTION. THERE WAS A REFERENCE TO A "STOPLIGHT AWARD" THAT MICHELLE BORBOA WON.

CAN YOU EXPLAIN WHAT THE STOPLIGHT AWARD IS?

**A.** I'M NOT FAMILIAR WITH THAT PARTICULAR ONE, BUT FROM MY EXPERIENCE, MY TAKE ON IT IS THAT IT'S JUST A RECOGNITION AWARD, AND AS I UNDERSTOOD IT, IT WAS RELATED TO RETURNING CLAIMANTS TO WORK. IT'S JUST A RECOGNITION THAT THAT'S SOMETHING LINCOLN EMPHASIZES -- THAT'S A GOAL OF OURS, THAT WE WANT TO SEE CLAIMANTS RETURN TO WORK. SO WHEN WE SEE A CLAIMS EXAMINER FOCUS ON THAT, WE WANT TO RECOGNIZE THEM FOR IT.

**Q.** ARE THERE OTHER NAMES FOR AWARDS THAT YOU HAVE IN YOUR

DEPARTMENT?

**A.** SURE. AGAIN, WE WANT TO EMPHASIZE GOOD WORK, TEAMWORK, DOING WHAT YOU'RE SUPPOSED TO DO. SO WE HAVE SHOUT-OUT PROGRAMS, WHERE ANYBODY CAN RECOGNIZE ANYBODY FOR GOOD WORK. IF SOMEBODY RECEIVED A COMPLIMENT FROM A CLAIMANT THAT THEY DID A THOROUGH JOB AND ANSWERED THEIR QUESTIONS, THEY COULD RECEIVE A SHOUT-OUT FOR THAT.

THERE ARE DIFFERENT ASPECTS, BUT AGAIN, I THINK IT'S JUST RECOGNIZING GOOD WORK THROUGHOUT THE COMPANY.

**Q.** DURING YOUR DEPOSITION, WHICH THE JURY HAD A CHANCE TO REVIEW, YOU WERE SHOWN A COUPLE OF SENTENCES FROM LINCOLN'S GOALS AND METRICS FOR CLAIMS EXAMINERS. I WANT TO ACTUALLY TALK ABOUT THOSE SAME STANDARDS AND GOALS IN A LITTLE MORE DETAIL, IF WE COULD, A LITTLE MORE COMPLETELY.

LET'S LOOK AT 302-3. CAN YOU PULL THAT UP ON THE SCREEN -- IT SHOULD BE IN FRONT OF YOU.

FIRST, CAN YOU EXPLAIN JUST GENERALLY FOR THE JURY, WHAT ARE THESE? WHAT ARE WE LOOKING AT HERE IN THIS DOCUMENT?

**A.** SO EACH EMPLOYEE HAS GOALS THAT ARE SET FOR THEM EVERY YEAR, AS FAR AS THEIR ANNUAL PERFORMANCE. WE WANT TO MAKE SURE THEY HAVE METRICS AND STUFF THAT THEY WORK TOWARDS AND CAN ACCOMPLISH. THESE LOOK LIKE THEY'RE FOR -- UH, FOR CLAIMS EXAMINERS. THAT WOULD HAVE APPLIED TO MICHELLE IN HER ROLE.

**Q.** THESE SPECIFIC GOALS, GOALS AND METRICS, AS THEY'RE CALLED, THESE WOULD APPLY TO ALL CLAIMS EXAMINERS WHO HANDLE

DR. SAHA'S CLAIM AS WELL AS MS. BORBOA?

**A.** CORRECT. YEAH, THESE WOULD HAVE BEEN APPLIED TO ALL ALL THE LONG-TERM FACILITY CLAIMS EXAMINERS.

**MR. MULVANEY:** YOUR HONOR, I BELIEVE THIS HAS BEEN OFFERED AND ADMITTED, BUT --

**THE COURT:** IT HAS BEEN ADMITTED ALREADY, YES.

THANK YOU.

**BY MR. MULVANEY:**

**Q.** LET'S TALK IN GENERAL AGAIN. I DON'T WANT TO TALK IN SPECIFIC DETAIL ABOUT EVERY SINGLE ITEM ON HERE, BUT LET'S START AT THE TOP UNDER CUSTOMER SERVICE METRICS.

IF YOU CAN PULL THAT OUT. CAN YOU EXPLAIN GENERALLY WHAT THIS GOAL IS, WHAT THIS STANDARD IS FOR CLAIMS EXAMINERS?

**MR. HERNANDEZ:** OBJECTION. CUMULATIVE.

**THE COURT:** OVERRULED. YOU MAY ANSWER.

**THE WITNESS:** AGAIN, THESE ARE AGAIN HOW WE WANT TO MAKE SURE OUR CUSTOMERS ARE TREATED. AGAIN, WE WANT TO MAKE SURE THAT WE MAKE COMMITMENTS TO PROCESS CLAIMS TIMELY, THAT WE'RE FORTHCOMING AND RESPONSIVE TO INQUIRIES FROM THEM, AND THEN I THINK ONE OF THE THINGS IS LIKE RETURNING PHONE CALLS. 100 PERCENT OF PHONE CALLS WITHIN 24 HOURS. SO THE CLAIMANT CALLS US. WE WANT TO MAKE SURE THAT CALL. THEY OBVIOUSLY HAVE QUESTIONS FOR US. WE WANT TO MAKE SURE THAT THEY GET THOSE ANSWERED AS SOON AS POSSIBLE. SO THAT'S A COMMITMENT THAT WE WANT OUR CLAIMS AND FAMILIES TO DO.

**BY MR. MULVANEY:**

**Q.** AND THE LAST PARAGRAPH HERE -- WHAT IS THE GOAL THERE THAT'S BEING COMMUNICATED TO YOUR CLAIMS EXAMINERS?

**A.** THAT'S JUST THE EXPECTATION OUR CUSTOMERS HAVE OF US. IF THEY REACH OUT TO US, IF THEY NEED INFORMATION FROM US OR WANT TO PROVIDE SOMETHING, WE WANT TO MAKE SURE WE RESPOND TO THOSE REQUESTS WITHIN OUR GUIDELINES AND PROVIDE THE APPROPRIATE PROVISION.

**Q.** LET'S LOOK AT THE SECOND CATEGORY UNDER THESE GOALS AND METRICS. QUALITY AND RISK MANAGEMENT. COULD YOU GENERALLY EXPLAIN WHAT THIS STANDARD, THIS GOAL, IS FOR CLAIMS EXAMINERS?

**A.** THIS IS ABOUT HOW YOU PROCESS CLAIMS -- DIFFERENT ASPECTS OF CLAIMS PROCESSING THAT OCCUR THROUGHOUT THE LIFE OF A CLAIM.

BASICALLY, THIS IS ABOUT DOING THOROUGH, TIMELY INVESTIGATIONS, KEEPING CLAIMANTS UP TO DATE ON THE STATUS, AND SETTING EXPECTATIONS FOR THEM AS FAR AS WHAT THE REVIEW AND THE CLAIMS PROCESS WILL LOOK LIKE.

**Q.** WHAT ABOUT THIS "ACTION PLAN" ITEM THERE -- WHAT IS THAT, IN GENERAL, IF YOU CAN EXPLAIN WHAT THAT GOAL IS FOR YOUR CLAIMS EXAMINERS?

**A.** SO AS PART OF MANAGING A CLAIM, YOU NEED TO SET A CLEAR PATH AS FAR AS WHERE YOU EXPECT THAT CLAIM TO GO. THIS ACTION PLAN WILL DETAIL, FOR THE CLAIMS EXAMINER, WHAT THEY'RE LOOKING AT, WHAT THEY'VE CONSIDERED, AND WHERE THEY EXPECT IT TO GO.

SO AGAIN, IT JUST IDENTIFIES OPPORTUNITIES -- LIKE WHEN

THEY'RE GOING TO FOLLOW UP ON THE CLAIM, WHETHER THERE ARE ADDITIONAL RESOURCES TO PROVIDE TO THE CLAIMANT, LIKE VOCATIONAL SERVICES, AND THE LIKE.

**Q.** WHAT DOES THAT MEAN? WHAT WHAT IS VOCATIONAL SERVICES? WHAT'S THE GOAL THERE?

**A.** SO WE UNDERSTAND THIS IS ALL RELATED TO WHAT A PERSON DOES AS FAR AS THEIR OCCUPATION, WHAT THEY CAN AND CANNOT DO.

SO THERE'S OFTEN TIMES THAT THERE'S ASSISTANCE FROM VOCATIONAL EXPERTS THAT CAN BE IDENTIFIED TO HELP PEOPLE BACK TO WORK, WHETHER TO -- SIT-STAND WORKSTATION IS A VERY COMMON ONE. SOMEBODY THAT CAN'T SIT STAND FOR ANY PARTICULAR GIVEN TIME, THEY CAN THEY CAN DO THAT.

SO IT'S JUST OFFERING RESOURCES TO THEM AND SAY, OKAY, BASICALLY CURRENTLY DO MIGHT NOT BE ABLE TO RETURN TO WORK, BUT WE CAN PROVIDE YOU RESOURCES THAT WILL FACILITATE THAT RETURN TO WORK AND RETURN TO YOUR OCCUPATION.

**Q.** LET'S LOOK AT THE LAST ITEM AT THE END OF THE PAGE -- "CONDUCT APPROPRIATE AND THOROUGH TELEPHONE CONTACTS." WHAT IS -- CAN YOU EXPLAIN GENERALLY WHAT THIS GOAL IS THAT YOU EXPECT OF YOUR CLAIMS EXAMINERS?

**A.** YEAH, THAT'S JUST THE EXPECTATION THAT WE WANT TO MAKE SURE WE DO THOROUGH INVESTIGATIONS, THAT CLAIMANTS ARE KEPT UP TO DATE ON THAT, THAT THEY'RE INFORMED OF WHAT THE CLAIMS PROCESS IS, WHERE WE EXPECT THE CLAIM TO GO, AND WHAT THEY CAN PROVIDE TO SUPPORT THEIR CLAIM. IT JUST EMPHASIZES THAT AS AN

EXPECTATION FOR THE CLAIM.

**Q.** LET'S LOOK BRIEFLY AT THE NEXT PAGE OF THE GOALS AND STANDARDS. THIS IS CAREER DEVELOPMENT AND LEADERSHIP. CAN YOU DESCRIBE, AGAIN JUST GENERALLY, WHAT THIS GOAL, STANDARD, EXPECTATION IS FOR YOUR CLAIMS EXAMINERS?

**A.** YEAH, SO THIS IS ABOUT WANTING LINCOLN EMPLOYEES TO IMPROVE THEMSELVES AND BE GOOD TEAM MEMBERS. THIS LAYS OUT GOALS THAT WE LOOK FOR FOR CLAIMS EXAMINERS TO CONTINUE THEIR EDUCATION, MAKE SURE THEY'RE TAKING APPROPRIATE TRAININGS, AND AGAIN, BEING HELPFUL TO THEIR TEAMMATES WHEN APPROPRIATE.

**Q.** LET'S LOOK AT THAT THIRD LINE. YOU MENTIONED TRAINING -- "ALL REQUIRED TRAININGS ARE COMPLETED ON TIME." LET'S BACK UP AND ASK A GENERAL QUESTION. WHAT TRAINING IS PROVIDED FOR CLAIMS EXAMINERS -- FOR INSTANCE, THE ONES THAT WOULD HAVE BEEN WORKING WITH DR. SAHAI, INCLUDING MS. BORBOA?

**A.** SO FROM THE BEGINNING, WHEN A CLAIMS EXAMINER IS INITIALLY HIRED, THEY GO THROUGH A FOUR-TO-SIX-WEEK TRAINING CLASS WITH A TRAINER. THAT'S WHERE THEY LEARN THE BASICS -- WHAT A POLICY IS, WHAT A CLAIM IS, DIFFERENT POINTS IN THE CLAIM, HOW TO INVESTIGATE. TOWARD THE END OF THAT TRAINING, THEY ACTUALLY START RECEIVING LIVE CLAIMS, WORKING WITH THE TRAINER, GOING THROUGH THE STEPS TO INVESTIGATE A CLAIM -- WHAT AN INITIAL PHONE CALL LOOKS LIKE, CONDUCTING AN INITIAL PHONE CALL.

ONCE THEY BECOME PROFICIENT AT THAT, THEY'RE RELEASED FROM THAT TRAINING CLASS AND PAIRED WITH A MENTOR. THAT MENTOR

WORKS VERY CLOSELY WITH THEM FOR THE NEXT FOUR TO SIX MONTHS, MAKING SURE THEY UNDERSTAND THE CLAIMS PROCESS, SIGNING OFF ON THE WORK THEY DO, THAT IT MEETS OUR STANDARDS. AND AS THAT PROGRESSES OVER THE SIX MONTHS, THE MENTOR STARTS PULLING BACK, AND THE EXAMINER STARTS HANDLING MORE ON THEIR OWN, TO THE POINT WHERE THEY DON'T NEED THAT DIRECT MENTOR ANYMORE.

THEN, THROUGHOUT THAT TIME AND BEYOND, THEY'RE PAIRED WITH THEIR MANAGER, WHO IS THEIR PERSON TO PROVIDE GUIDANCE, TRAINING, AND COACHING ON ANYTHING THAT HAPPENS RELATED TO CLAIMANTS.

**Q.** IS THAT TRAINING YOU JUST DESCRIBED REQUIRED FOR ALL CLAIMS EXAMINERS, INCLUDING THE PEOPLE WHO WOULD HAVE BEEN WORKING WITH DR. SAHAI?

**A.** CORRECT. YEAH, ALL CLAIMS EXAMINERS GO THROUGH A SIMILAR TYPE OF TRAINING AND MENTORING PHASE, TO MAKE SURE THEY CAN HANDLE THOSE CLAIMS.

**Q.** IS THERE SPECIFIC TRAINING FOR CALIFORNIA?

**A.** CORRECT. EVERYONE IN THE CLAIMS DEPARTMENT IS REQUIRED TO GO THROUGH ANNUAL TRAINING. THERE'S DIFFERENT REQUIRED TRAINING THAT THEY HAVE TO DO -- THEY TAKE A COURSE, IT'S AN ONLINE COURSE, THEY TAKE A TEST, AND THE TEST CERTIFIES THAT THEY UNDERSTAND THE MATERIAL. THAT'S REQUIRED EVERY YEAR.

**Q.** I WANT TO SHIFT GEARS NOW AND TALK ABOUT ANOTHER ASPECT OF THE GOALS AND STANDARDS THAT YOU DISCUSSED A LITTLE BIT IN YOUR DEPOSITION, BUT I WANT TO GO INTO A LITTLE MORE DETAIL WITH YOU

ABOUT THE ISSUE OF THE GOAL TO RETURN CLAIMANTS TO WORK.

IF WE CAN LOOK AT 302-7 -- "CLAIMANTS BACK TO WORK, RTW."

SO LET'S BACK UP FIRST, AND AND LET ME ASK YOU THIS: DID THESE GOALS, THIS SPECIFIC GOAL, IS THIS SOMETHING THAT APPLIES TO CLAIMS EXAMINERS?

**A.** THIS WOULD HAVE BEEN A GOAL FOR A CLAIMS EXAMINER FOR 2023.

**Q.** OKAY. AND WE THERE HAVE BEEN THE JURY HAS SEEN DOCUMENTS SIMILAR TO THIS, AND ANOTHER DOCUMENT FROM I BELIEVE PREVIOUS YEAR 2022, WHERE THE RTW METRIC WAS 35 PERCENT.

DO YOU -- DO YOU RECALL THAT?

**A.** I RECALL THAT.

**Q.** I WANT TO TALK ABOUT THIS NOW. THERE'S BEEN A LOT OF DISCUSSION ABOUT WHAT THIS MEANS. THIS THIS GOAL, AS IT STATED UNDER LINCOLN'S GOALS AND METRICS, ASSIST CLAIMANTS BACK TO WORK. RTW. WHAT WHAT DOES THAT MEAN? WHAT IS THAT GOAL?

**A.** SO ONE OF THE THINGS WE BELIEVE AT LINCOLN IS THAT IT'S IMPORTANT FOR CLAIMANTS TO BE ABLE TO GO BACK TO WORK. WE WANT TO PROVIDE THEM A BENEFIT WHILE THEY NEED IT, WHILE THEY'RE UNABLE TO WORK, BUT WITH THE ULTIMATE GOAL THAT THEY WILL GET BACK TO WORK, EITHER IN THEIR OWN OCCUPATION OR SOME OTHER OCCUPATION.

SO IT'S IMPORTANT FOR CLAIMS EXAMINERS TO KEEP THAT IN MIND AS THEY'RE INVESTIGATING CLAIMS AND TALKING WITH CLAIMANTS -- TO HAVE THOSE DISCUSSIONS WITH THEM, ABOUT ASSISTING THEM BACK TO WORK -- INSTEAD OF JUST MANAGING THE CLAIM, PROVIDING

VOCATIONAL ASSISTANCE, WORKING WITH THEIR EMPLOYER TO FIND SOME OTHER ROLE OR ACCOMMODATION THAT WILL ALLOW THEM TO GO BACK TO WORK.

**Q.** WHY -- WHY HAVE A 35 PERCENT OR 40 PERCENT RTW, RETURN-TO-WORK, GOAL? WHY IS THAT SOMETHING THAT YOU DO?

**A.** IT'S JUST BASED ON OUR EXPERIENCE. LOOKING ACROSS THE CLAIMS THAT WE RECEIVE, WE EXPECT ROUGHLY 35 TO 40 PERCENT OF CLAIMANTS TO GO BACK TO WORK AT SOME POINT IN TIME.

SO THAT'S JUST ONE ASPECT -- I THINK IT'S IMPORTANT THAT CLAIMS EXAMINERS CONTINUE THOSE CONVERSATIONS WITH CLAIMANTS, SO THEY UNDERSTAND AND KNOW THE EXPECTATIONS OF THE CLAIM AND WHERE IT MAY GO.

**Q.** IS THIS A CLAIMS CLOSURE PERCENTAGE? IS THAT REFERRING TO A PERCENTAGE EXPECTED TO CLOSE CLAIMS OR DENY CLAIMS?

**A.** ABSOLUTELY NOT. IT'S TO ASSIST CLAIMANTS BACK TO WORK, AND THAT'S THE WIN FOR ALL INVOLVED. SO FROM THE CLAIMANT, THE EMPLOYER AND LINCOLN, THE CLAIMANT GOES BACK TO WORK, THAT'S THE NATURAL END OF THE CLAIM. THEY NO LONGER NEED US ANYMORE. THEY NO LONGER NEED THE BENEFIT IF THEY'RE BACK WORKING FULL-TIME AND RECEIVING FULL SALARY.

**Q.** IS THERE A DIFFERENCE IN YOUR SYSTEM IN TERMS OF HOW A CLAIM IS CODED, WITH RESPECT TO WHETHER IT'S CODED AS RETURNED TO WORK VERSUS CODED AS DENIED BECAUSE NOT TOTALLY DISABLED?

**A.** YEAH, WE CODE THOSE DIFFERENTLY. WITHIN THE SYSTEM WE HAVE, THERE ARE CLOSURE CODES -- WHEN THE CLAIM ENDS, WE HAVE

TO TIME-STAMP IT, CAPTURE IT. THERE ARE SPECIFIC CODES FOR RETURN TO WORK -- WHEN A CLAIMANT ACTUALLY DOES RETURN TO WORK AND THE CLAIM ENDS, THAT'S WHAT WE CODE IT AS. IN A CASE LIKE DR. SAHAI'S CLAIM, IT WAS A DECISION THAT SHE WAS NOT TOTALLY DISABLED, AND WE WOULD CODE IT AS SUCH -- I BELIEVE IN THIS CASE, THE CLAIM WAS CODED AS NOT TOTALLY DISABLED FROM OCCUPATION. IT WAS NEVER CODED AS A RETURN TO WORK.

**Q.** SO WOULD DR. SAHAI'S CLAIM, IN YOUR REVIEW OF THIS CLAIM FILE -- MICHELLE BORBOA'S DECISION IN THIS CASE, AND THE WAY IT WAS CODED -- WOULD THAT EVEN COUNT TOWARDS THIS 40 PERCENT RETURN-TO-WORK METRIC?

**A.** NO, IT WOULD NOT. SO IF SHE HAD MADE, SAY, TEN DECISIONS IN A MONTH, AND FOUR WERE RETURN TO WORK, DR. SAHAI'S WOULD HAVE BEEN IN THE OTHER SIX.

**Q.** YOU READ MR. WELTY'S TESTIMONY -- THE FORMER INSURANCE DISABILITY COMPANY EMPLOYEE WHO TESTIFIED THAT, IN HIS VIEW, THIS WAS INAPPROPRIATE AND WAS A GOAL TO CLOSE CLAIMS. IS THAT ACCURATE, FROM LINCOLN'S PERSPECTIVE?

**A.** NO. AGAIN, WE BELIEVE THIS IS AN APPROPRIATE GOAL, BASED ON OUR EXPERIENCE OF WHAT WE SEE IN OUR CLAIMS BLOCK THAT WE EXPECT 35 TO 40 PERCENT OF CLAIMANTS TO GO BACK TO WORK.

**Q.** IS THERE A REWARD OR INCENTIVE FOR EITHER A GROUP, A DEPARTMENT, OR AN INDIVIDUAL FOR MEETING THIS PARTICULAR METRIC?

**A.** YEAH, NO, THERE'S NO PARTICULAR AWARD. THERE'S NO AWARD

FOR CLOSING CLAIMS, WHETHER IT BE A RETURN TO WORK. AGAIN, THIS IS JUST AN EXPECTATION WE HAVE IN CLAIM DECISIONS. WE DON'T REWARD THE OUTCOME OF THE CLAIM -- RETURN TO WORK -- ESPECIALLY DENIALS, WE DON'T REWARD THOSE DECISIONS.

**Q.** MR. SCHAAPVELD, IS THERE ANY FINANCIAL INCENTIVE FOR A PARTICULAR CLAIMS EXAMINER -- ANY OF THE ONES, FOR INSTANCE, THAT WORKED ON DR. SAHAI'S CLAIM, INCLUDING MS. BORBOA FOR CLOSING A CLAIM OR DENYING A CLAIM AS NOT TOTALLY DISABLED?

**A.** NO, THERE'S NO FINANCIAL INCENTIVE TIED TO A CLAIM DECISION.

**Q.** ONE OTHER ISSUE THAT WAS DISCUSSED, IN PARTICULAR WITH MR. WELTY, WAS THE "OVERTURN RATE," AND SPECIFICALLY MS. BORBOA'S OVERTURN RATE.

FIRST, LET'S EXPLAIN WHAT IS MEANT BY OVERTURN RATE FOR THE JURY.

**A.** IN SIMPLE TERMS, IT MEANS OF THE CLAIMS THAT WERE APPEALED, A CERTAIN PERCENTAGE WERE OVERTURNED VERSUS UPHELD. AS PART OF THAT APPEAL REVIEW PROCESS, IT WAS DECIDED THAT THE CLAIM WAS OVERTURNED AND ADDITIONAL BENEFITS WERE PAID PAYABLE ON THE CLAIM.

**Q.** LET'S LOOK AT A DOCUMENT THAT I BELIEVE IS EXHIBIT 306. IS THAT CORRECT, JUDGE?

**THE COURT:** 306 IS IN EVIDENCE -- PROCEED.

**BY MR. MULVANEY:**

**Q.** EXHIBIT 306-2. LET'S HIGHLIGHT THE APPEAL RATE HERE.

FIRST, FOR THE PURPOSE OF THE JURY -- IS THIS MICHELLE BORBOA'S -- PART OF HER PERFORMANCE REVIEW, IN TERMS OF LINCOLN'S FILES?
**A.** YES, THOSE ARE COMMENTS THAT WERE MADE AS PART OF THE ANNUAL REVIEW.
**Q.** AND AGAIN, WHAT DOES THIS MEAN? CAN YOU EXPLAIN TO THE JURY WHAT THIS NOTATION MEANS, FOR MS. BORBOA?
**A.** IT SIMPLY INDICATES THAT OF SIX APPEAL FILES, 33 PERCENT OF HER DECISIONS WERE UPHELD, VERSUS A TEAM AVERAGE OF 44 PERCENT. SO JUST COMPARING MICHELLE'S SIX FILES TO WHAT THE TEAM'S EXPERIENCE WAS.
**Q.** OKAY. NOW LET'S TURN -- WE'LL COME BACK TO THIS -- AND LOOK AT EXHIBIT 306-15, WHICH IS THE FOLLOWING YEAR. AND IF YOU COULD HIGHLIGHT "APPEAL RATE '21" -- OKAY, FIRST QUESTION FOR THE JURY: THIS ALSO RELATES SPECIFICALLY TO MS. BORBOA, IS THAT RIGHT?
**A.** I BELIEVE SO, YES, AND THERE ARE COMMENTS IN THERE.
**Q.** AND AGAIN, EXPLAIN WHAT THIS NOTATION MEANS WITH RESPECT TO MS. BORBOA.
**A.** IT'S JUST CALLING OUT THAT 21 OF HER DECISIONS WERE APPEALED, AND 43 PERCENT WERE UPHELD, COMPARED TO A TEAM AVERAGE OF 53 PERCENT -- AGAIN JUST COMPARING WHERE MICHELLE WAS TO THE TEAM.
**Q.** LET'S PULL UP BOTH OF THOSE AND LOOK AT THEM TOGETHER. MR. WELTY, IN HIS TESTIMONY, WAS CRITICAL OF MS. BORBOA'S OVERTURN RATE. I WANT TO ASK YOU, HAVING REVIEWED THE FILE,

AND AS A MANAGER AND 20-YEAR LINCOLN EMPLOYEE IN THE DISABILITY UNIT -- DOES THIS CONCERN YOU?

**A.** IT REALLY TELLS YOU NOTHING AS FAR AS THE QUALITY OF THE DECISION. AN OVERTURN RATE IS SIMPLY SOMETHING THAT WAS RETURNED TO CLAIMS, IT DOESN'T TELL YOU WHETHER THE DECISION THE CLAIMS EXAMINER MADE AT THE TIME WAS CORRECT.

OFTENTIMES, AS PART OF THE APPEAL PROCESS, NEW EVIDENCE IS PRODUCED THAT WASN'T AVAILABLE TO THE CLAIMS EXAMINER AT THE TIME. SO IT HAS NO BEARING ON WHETHER IT WAS THE APPROPRIATE DECISION AT THE TIME.

**Q.** DOES THE SAMPLE SIZE HAVE ANY BEARING ON WHETHER THAT'S A CONCERN TO YOU, JUST IN TERMS OF THE NUMBERS?

**A.** AGAIN, THESE ARE JUST THE NUMBER OF CLAIMS THAT WERE ULTIMATELY APPEALED -- IT'S NOT REPRESENTATIVE OF ALL THE DECISIONS MICHELLE MADE THAT COULD HAVE BEEN APPEALED. IT'S A SMALL NUMBER.

**Q.** AND IN ALL OF THESE, THE NUMBERS THAT WE'RE LOOKING AT HERE WITH MICHELLE, IN ANY DECISION THAT WAS MADE BY HER THAT SHOWS UP IN HER OVERTURN RATE. WOULD THOSE DECISIONS HAVE BEEN REVIEWED AND APPROVED BY A MANAGER?

**A.** AT TWO DIFFERENT POINTS?

SO AGAIN, WHEN WHEN A CLAIM CENTER MAKES AN ADVERSE CLAIMS DECISION OR MAKES A RECOMMENDATION FOR AN ADVERSE CLAIMS DECISION, BEFORE THEY CAN MOVE FORWARD WITH THAT, THEY NEED TO SEND IT TO THEIR MANAGER FOR OVERSIGHT.

SO LIKE IN THIS CASE, MICHELLE, AFTER I'VE REVIEWED THE EVIDENCE, HAD WRITTEN UP AND MADE A RECOMMENDATION FOR ROBERT TO REVIEW THAT. AS PART OF THAT REVIEW, THE MANAGER WILL LOOK AT ALL THE EVIDENCE THAT IS IN THE FILE, WHAT THE RECOMMENDATION WAS FROM MICHELLE, AND THEN AGAIN, IF THERE'S AN OPPORTUNITY TO FURTHER REVIEW, THEY CAN MAKE THAT RECOMMENDATION, OR ULTIMATELY THEY AGREE WITH IT. THEY CAN SIGN OFF ON A DECISION BEING MADE. SO THE MANAGER HAS REVIEWED THAT DECISION BEFORE IT'S MADE.

AND THEN IF IT DOES GO THROUGH THE APPEAL PROCESS, IT'S APPEALED, AND ULTIMATE DECISION IS TO OVERTURN IT, RETURN IT TO CLAIMS. THAT OVERTURN APPEAL IS SENT BACK TO THE MANAGER TO REASSIGN THAT. SO THE MANAGER IS SEEING THAT AS IT'S COMING BACK FROM THE APPEALS DEPARTMENT AND HAS AN OPPORTUNITY TO LOOK AT WHAT WAS THE DECISION MADE AT THE TIME WAS DENIED, WHAT WAS PRODUCED DURING THE APPEAL PROCESS, AND ASSESS IF THERE WAS OPPORTUNITIES.

AGAIN, THEY WOULD FEEL IF THERE WERE, THEY COULD PROVIDE COACHING TO THAT CLAIMS EXAMINER, OR IF IT'S JUST BASED ON THE EVIDENCE, IT WAS IN THE DECISION, AND THEN WE JUST CONTINUE TO PAY THE BENEFIT AND ANSWER THEM APPROPRIATELY.

**Q.** FIRST, EVEN DURING THE DEPOSITION AND THE PORTIONS THAT WERE SHOWN, YOU CAN TAKE THAT DOWN. THE PORTIONS THAT WERE SHOWN TO THE JURY. THERE WERE A LOT OF QUESTIONS ASKED YOU, MR. DAWSON, ABOUT PROFIT, PROFITABILITY.

FIRST, LET ME ASK THIS QUESTION: IS IS LINCOLN A FOR-PROFIT COMPANY?
**A.** YES, IT IS. IT IS FOR PROFIT.
**Q.** THE SUGGESTION WAS MADE NOT ONLY IN OPENING STATEMENT, BUT ALSO MR. WELTY THAT THAT DENYING CLAIMS IS IS PROFITABLE IS A WAY THAT THAT A COMPANY BECOMES PROFITABLE.
IS THAT -- IS THAT ACCURATE FROM YOUR PERSPECTIVE?
**A.** NO, I THINK THAT'S AWFULLY SHORT SIGHTED. AGAIN, AS A FOR-PROFIT COMPANY, AGAIN, IF WE IF WE WRONGLY DENY CLAIMS, OUR CLAIMANTS ARE GOING TO TALK TO THEIR EMPLOYER, THEY'RE GOING TO TELL THEM THE EXPERIENCE THEY HAVE. THAT THAT REPUTATION IS GOING TO BE CONVEYED TO THEM, AND THEY'RE NOT GOING TO DO BUSINESS WITH US.
SO IF WE IF WE LOOK SHORT SIGHTED AND TRY TO DENY WRONG CLAIMS FOR PROFIT, WE'RE GOING TO NOT OBTAIN NEW BUSINESS OR KEEP PEOPLE WITH US THAT HAVE THAT BUSINESS. SO AGAIN, AND IT DOESN'T MAKE SENSE TO DENY A CLAIM FROM OFF THE DOOR.
**Q.** FINAL QUESTION ON THAT: IN YOUR ENTIRE 20 YEARS AT LINCOLN AND EVERY ROLE THAT YOU'VE HAD, FROM CLAIMS EXAMINER TO MANAGER, HAVE YOU EVER, IN YOUR EXPERIENCE AT LINCOLN, SEEN THAT THERE WAS ANY FINANCIAL INCENTIVE OR FOR ANY CLAIMS EXAMINER, ANY EMPLOYEE IN THE DISABILITY DEPARTMENT, BASED ON PROFIT OR BASED ON DENYING CLAIMS TO TO ACHIEVE PROFIT,
**A.** ABSOLUTELY NOT. NO, I'VE NEVER SEEN WHERE CLAIMS EXAMINER HAS BEEN AWARDED AND THEN RECEIVE A FINANCIAL BENEFIT FOR

MAKING AN ADVERSE DECISION. THIS IS NOT SOMETHING THAT WE DO.

**Q.** LAST AREA, THE OPENING STATEMENT, THE PLAINTIFFS' COUNSEL TALKED ABOUT LINCOLN'S INCENTIVES AND ANNUAL BONUSES, AND AVAILABILITY FOR ANNUAL BONUSES. I WANT TO TALK ABOUT THAT SPECIFICALLY BEFORE WE WRAP UP. IS THERE AN ANNUAL BONUS INCENTIVE OPPORTUNITY FOR LINCOLN EMPLOYEES.

**A.** THERE IS. IT'S CALLED THE ANNUAL INCENTIVE PLAN, OR SHORT, AIP.

AGAIN, AS AS A COMPANY, AGAIN, BELIEVES THAT AGAIN, IF WE DO WELL, THAT WE SHOULD SHARE THAT WITH THE EMPLOYEES. AND SO THIS IS A BONUS THAT'S AVAILABLE FOR ALL LINCOLN EMPLOYEES ACROSS THE ENTIRE ORGANIZATION. AND SO, AND BASICALLY, IT'S BASED ON AGAIN THE COMPANY'S PERFORMANCE, HOW THEY DO ON VARIOUS METRICS. ARE WE MAKING APPROPRIATE SALES GOALS? ARE WE MEETING OUR BUDGET OBLIGATIONS? SO, IF WE MEET THOSE EXPECTATIONS, THEN ALL EMPLOYEES ARE ELIGIBLE FOR THAT BONUS.

**Q.** AND IS EMPLOYEE IS IS THEIR ELIGIBILITY BASED ON THEIR A RATING THAT THEY RECEIVE DURING THE YEAR FOR THEIR PERFORMANCE.

**A.** YEAH, AS PART OF THE ANNUAL REVIEW PROCESS, THAT MANAGER WILL ASSESS THEIR EMPLOYEE AS FAR AS HOW THEY'VE DONE VERSUS THEIR PARTICULAR GOAL SET THE YEAR, AND THEY'LL THEY'LL RECEIVE A RATING OF ONE AND A FIVE. SO A THREE IS RIGHT IN THE MIDDLE OF MEETING EXPECTATIONS. THE VAST MAJORITY OF STAFF MEET THEIR GOALS, AND SO THAT THEY WOULD BE ELIGIBLE FOR THAT BONUS FOR THE THREE RATING.

**Q.** IS THE ANNUAL BONUS INCENTIVE PLAN IN ANY WAY TIED TO THE DISABILITY GROUP AND HOW MANY CLAIMS ARE DENIED?

**A.** ABSOLUTELY NOT. NO, NONE OF THE GOALS THAT WE HAVE ARE TIMED TO DENYING CLAIMS.

**Q.** AND IS ANYONE'S AVAILABILITY TO RECEIVE A BONUS UNDER THE ANNUAL INCENTIVE PLAN FOR THE ACROSS THE ENTIRE COMPANY RELATED AT ALL TO CLAIMS OR HOW CLAIMS ARE HANDLED?

**A.** NO. AGAIN, WE DON'T DON'T INCENTIVIZE CLAIMANTS OR CLAIMERS TO DENY CLAIMS. WE INCENTIVIZE THEM TO DO THOROUGH, PROPER INVESTIGATIONS. MANAGE THOSE CLAIMS AS THEY SHOULD.

**MR. MULVANEY:** THANK YOU, MR. SCHAAPVELD. THAT'S ALL THE QUESTIONS I HAVE FOR NOW.

THANK YOU.

**THE COURT:** THANK YOU.

CROSS-EXAMINATION?

**MR. HERNANDEZ:** YOUR HONOR, CAN WE TAKE A BATHROOM BREAK. IT THAT OKAY?

**THE COURT:** WE CAN. LET'S TAKE A FIVE-MINUTE RECESS. WE'LL COME BACK AT 10:40.

(JURY OUT AT 10:41)

(RECESS FROM 10:41 A.M. UNTIL 10:44 A.M.)

(JURY IN AT 10:44)

**THE COURT:** WELCOME BACK EVERYONE. PLEASE BE COMFORTABLE. YOU MAY PROCEED.

**CROSS-EXAMINATION**

BEYOND THE END OF THE CLAIM. AGAIN, IT'S NOT. SHE'S BACK TO WORK. SHE'S NOT. THAT BENEFIT'S NO LONGER PAYABLE.

**BY MR. HERNANDEZ:**

**Q.** OKAY, AND IN 2023, LINCOLN RAISED THEIR PERCENTAGE GOAL FROM 35 PERCENT TO 40 PERCENT, RIGHT?

**A.** I BELIEVE THAT'S WHAT THE GOALS CHANGE WAS.

**Q.** AND YOU WOULD AGREE THAT RAISING IT FROM 35 TO 40 PERCENT WOULD PUT MORE MONEY IN LINCOLN'S POCKET, RIGHT?

**A.** YEAH, I THINK THAT'S JUST REFLECTIVE OF OUR EXPERIENCE, AND THAT WE WANT TO KEEP THAT IN THE FOREFRONT OF OUR CLAIMS EXAMINERS MIND WHEN THEY'RE INVESTIGATING CLAIMS. THAT AND THEY SHOULD BE TALKING TO THE CLAIMANTS ABOUT RETURN TO WORK. PART OF WHAT WE EXPECT CLAIMS EXAMINERS TO DO.

**Q.** I WANT TO TALK ABOUT THE ACTION PLAN OF A MICHELLE BORBOA. SHE SHE PUT RTW OO, CORRECT?

**A.** I BELIEVE THAT'S -- THAT PREVIOUSLY DID SAY THAT WHEN YOU SHOWED THE ACTION PLAN, YES.

**Q.** OKAY, SO WHAT HER ACTION PLAN WAS TO PUT DR. SAHAI AND SHE PUT HER IN A CATEGORY OF RETURN TO WORK ON OCCUPATION, CORRECT?

**A.** I BELIEVE THE SUBJECT LINE THERE SAID THAT AGAIN. I VIEW THAT AS A DIRECTIONAL PATH. I MEAN, I THINK I TESTIFIED THIS IN MY DEPOSITION. THOSE ARE ASPIRATIONAL AS FAR AS WHERE WE EXPECT THE CLAIM, WHERE WE EXPECT THE CLAIM TO GO. SO, AS WE'RE MANAGING A CLAIM, PAYING ONGOING BENEFITS, WE'LL PUT A LABEL ON THAT. AS FAR AS OKAY, THIS IS FOR ANYBODY THAT SEES

THAT, THEN OKAY, WE EXPECT THIS CLAIMANT TO GO BACK TO WORK AT SOME POINT IN TIME. SO JUST A DIRECTIONAL PATH. THAT'S WHAT THOSE ARE INTENDED FOR.

**Q.** AND IF SHE WAS SUCCESSFUL IN THAT RETURN TO WORK, YOU WOULD AGREE THAT THAT WOULD COUNT TOWARDS THAT 40 PERCENT METRIC, CORRECT?

**A.** YEAH, IF IF DR. SAHAI HAD RETURNED THE WORK AND THE CLAIM ENDED BECAUSE SHE RETURNED THE WORK, THAT WOULD HAVE BEEN PART OF THAT 40 PERCENT.

**Q.** OKAY, AND YOU WERE DESIGNATED TO SPEAK FOR LINCOLN ON DOCTORS TO HIGH DUTIES UNDER THE POLICY. OH, SORRY. LET ME STRIKE THAT QUESTION. I WANT TO BRING UP EXHIBIT 144 FIVE, AND I WOULD LIKE TO HIGHLIGHT SOME OF THE DR. CARLSON NOTES UNDER NOTE 67 AND NOTE 65. THIS STATES ON 5-3 2023, THE CLAIMANT ABIDES ME. HER PROVIDER, DR. CARLSON, HAS BEEN TRYING TO GET IN CONTACT WITH THE REVIEWER. AND THEN THE SECOND NOTE SAYS, ADBSAP CARLSON HAS ATTEMPTED TO CONTACT CDCP DR. FLORES, AND WERE UNABLE TO CONTACT THEM. SO WE'VE HEARD EVIDENCE THAT DR. BONZON REACHED OUT, BUT THIS IS ALSO EVIDENCE THAT DR. CARLSON WAS TRYING TO REACH OUT TO THE REVIEWER AND AND ALSO TRYING TO GET IN TOUCH.

**A.** I BELIEVE THAT'S WHAT THAT NOTE INDICATES THAT MICHELLE RECEIVED MESSAGES THAT AFFECT US.

**Q.** AND THERE WERE TWO DOCTORS THAT RESPONDED, CORRECT?

**A.** TO OUR RESPONDED TO WHAT?

NOTHING NEFARIOUS OR BAD FAITH ABOUT THAT PROTOCOL. IT WOULDN'T, WHAT WOULD BE BAD FAITH IS IF IN JANUARY THEY HAD AN ASPIRATION TO CLOSE THE CLAIM FOR -- BECAUSE THE PERSON IS NOT TOTALLY DISABLED WITHOUT SEEING ALL THE EVIDENCE, WITHOUT RECEIVING ALL THE EVIDENCE, WITHOUT SENDING THAT EVIDENCE TO A MEDICAL REVIEWER. THAT'S WHAT WE'RE TALKING ABOUT HERE.

BUT I DON'T KNOW IF HE MEANT TO, BUT BUT THE SUGGESTION THAT THE RETURN TO WORK CLAIMANT IS THEN CODED AS A I'M SORRY, THAT A DECISION LIKE THIS ONE MADE IN THIS CASE, WHERE LINCOLN DETERMINED SHE WAS NOT TOTALLY DISABLED FROM HER OWN OCCUPATION, SOMEHOW GETS CODED AS A RETURN TO WORK THAT QUALIFIES MICHELLE BORBOA TO ACHIEVE THE 35 PERCENT. THAT'S ABSOLUTELY FALSE. THAT'S NOT WHAT HAPPENED HERE. THEY PRESENTED NO EVIDENCE THAT'S HAPPENED -- THAT'S WHAT HAPPENED HERE. MR. DIGIANDOMENICO SAID NO, THIS WAS ENTERED INTO THE SYSTEM AS NOT TD. SO ALL OF THAT IS UNTRUE.

I NEXT WANT TO TURN, THOUGH, TO BACK TO THE MANAGING AGENT ISSUE. SO MANAGING AGENT. UNDER WHITE V. ULTRAMAR, I THINK THAT IS PRECEDENTIAL CASE. IN ORDER TO BE A MANAGING AGENT, AND JUST TO BE CLEAR, THERE'S ZERO EVIDENCE THAT I THINK THEY'VE ALREADY CONCEDED ON THIS BORBOA, BUT NEITHER MR. SCHAAPVELD OR MR. DIGIANDOMENICO IS A DIRECTOR OR OFFICER. THERE'S NO EVIDENCE FOR THAT. SO THAT LEAVES THE THIRD CATEGORY MANAGING AGENT. AND IN ORDER TO QUALIFY AS SUCH, UNDER THE WHITE CASE UNDER CALIFORNIA LAW, THAT PERSON HAS TO

EXERCISE SUBSTANTIAL INDEPENDENT AUTHORITY AND JUDGMENT IN THEIR CORPORATE DECISION MAKING SUCH THAT THEIR DECISIONS ULTIMATELY DETERMINE CORPORATE POLICY. MR. DIGIANDOMENICO IS A CLAIMS MANAGER. HE DOESN'T HAVE THAT TYPE OF AUTHORITY OR DECISION-MAKING POWER, AND THERE'S ZERO EVIDENCE CONTRARY TO THAT STATEMENT.

AND IN TERMS OF THE CORPORATION, THAT'S SPECULATIVE, THAT THE CORPORATION RATIFIED ANY SPECIFIC CONDUCT IDENTIFIED BY MR. DAWSON. THE FACT THAT THERE IS LITIGATION AND DR. SAHAI HAS NOT BEEN PAID, THAT DOESN'T REFLECT TODAY. THAT DOESN'T REFLECT RATIFICATION OF ANY OF THE SPECIFIC ALLEGED MISCONDUCT THAT PLAINTIFF IS POINTING TO.

SO THE RATIFICATION OF A CORPORATION JUST BASED ON SPECULATIVE SPECULATIONS BECAUSE WE'RE HERE IN COURT, THAT DOESN'T SATISFY THE REQUIREMENTS TO SHOW THAT A MANAGING AGENT, EITHER DIRECTLY OR INDIRECTLY, HAD ANY INVOLVEMENT IN THE ALLEGED MISCONDUCT.

THANK YOU, YOUR HONOR.

**THE COURT:** THANK YOU VERY MUCH.

**MR. DAWSON:** MAY I? I WILL LIMIT IT TO ONE.

**THE COURT:** IF YOU SPEAK NEAR MICROPHONE, YES.

**MR. DAWSON:** I WILL DO THAT.

SO WE WANT TO POINT OUT THAT IN THIS CONTEXT, THE DUTY OF GOOD FAITH, OF COURSE, IS ONGOING. LINCOLN IS CURRENTLY UNDER A DUTY OF GOOD FAITH AND FAIR DEALING, AND SO IT'S NOT LIKE THE

HEAR FROM THE DEFENSE.

**MR. MULVANEY:** YES, SIR. THE -- I SHOULD START WITH THE DOCUMENT THAT THEY REFERENCED. THEY WANTED TO QUESTION MR. SCHAAPVELD ABOUT THE SUBJECT OF COURT ORDER THIS AFTERNOON DENYING THEIR MOTION RESPECT TO THAT DOCUMENT. BUT BEYOND THAT, JUDGE MORE SERIOUS ISSUES. MR. SCHAAPVELD, TO BEGIN WITH, WAS NOT ON THEIR WITNESS LIST FOR THIS PURPOSE. MR. SCHAAPVELD APPEARED VOLUNTARILY TODAY UNDER NO OBLIGATION. HE'S NOT UNDER THE SUBPOENA POWER OF THE COURT. THERE IS NO SUBPOENA THAT'S BEEN ISSUED FOR HIM WHILE HE HAS BEEN HERE. DON'T KNOW OF THE AUTHORITY EVEN TO REQUIRE HIM TO STAY, NOT BEING UNDER SUBPOENA, NOT BEING THE POWER RECORDS IN OUR COURT.

BEYOND THAT, THOUGH, JUDGE, THERE'S BEEN NO FOUNDATION LAID AT ANY POINT, WHETHER IT'S IN HIS DEPOSITION OR OTHERWISE, THAT HE WOULD BE ABLE TO ADDRESS THESE ISSUES, AND THE SIMPLE FACT OF THE MATTER IS, HE CANNOT. HE IS A MANAGER IN THE CLAIMS DEPARTMENT IN THE APPEALS, SPECIFICALLY AREA OF THE CLAIMS DEPARTMENT. HE HAS ABSOLUTELY ZERO KNOWLEDGE OF COMPANY FINANCIALS, LIABILITIES, AND ASSETS, AND WOULD BE NO MORE CAPABLE, FOUNDATION-WISE, OF TESTIFYING TO THAT THAN ANYONE OFF THE STREET.

SO FOR THOSE REASONS, THERE'S NO BASIS WHATSOEVER TO ASK HIM TO REMAIN HERE OR TO REQUIRE HIM TO TESTIFY WITH RESPECT TO THESE ISSUES.

**THE COURT:** YOU MAY.

JURY, SO THE JURY COULD UNDERSTAND IT AND RENDER A FAIR VERDICT. SO THAT'S WHY I RULED THAT WAY LAST WEEK.

AND THE NEW EXHIBIT 318A, WELL, BETTER EXPLAINED NOW, STILL SUFFERS THE PROBLEM OF NOT HAVING A WITNESS TO A COMPETENT WITNESS TO TIFFANY TO WHAT IT MEANS, AND WOULD ALLOW COUNSEL ON BOTH SIDES TO MAKE FOUNDATIONLESS ARGUMENTS ABOUT THE SIGNIFICANCE AND WHAT WHAT IT MEANS FOR THE JURY. SO I'M NOT GOING TO ALLOW 318 IN. THAT REQUEST IS DENIED.

NOW, AS TO MR. SCHAAPVELD, AS I JUST REFERENCED, THIS ISSUE IS PRESENTED IN DOCKET 161, WHICH IS THE AMENDED JOINT TRIAL EXHIBIT, IN PART, AND ALSO IN THE JOINT WITNESS LIST. THE JOINT WITNESS LIST MENTIONS MR. SCHAAPVELD, BOTH PARTIES DO AS A TRIAL WITNESS, AND THERE'S A DESCRIPTION OF THE SUBSTANCE OF TESTIMONY. AND MR. SCHAAPVELD IS NOT IDENTIFIED AS SOMEONE WHO'S GOING TO TESTIFY ABOUT THE NET WORTH OF LINCOLN OR ON CONVICT DAMAGES TOPICS.

SO IT WAS NOT DISCLOSED BEFORE TRIAL, AND NOR WAS HE IDENTIFIED AS LINCOLN AS BEING SOMEONE WHO'S GOING TO TESTIFY ON THOSE TOPICS. AND BASED ON HIS TESTIMONY, I AM NOT PERSUADED BY THE PROFFER THAT HE HAS SOMETHING COMPETENT TO SAY ABOUT THE NET WORTH, AND THAT IT'D BE WORTH THE JURY'S TIME TO HEAR FROM HIM, OR THAT HE COULD COMPETENTLY EXPLAIN EXHIBIT 318, 318A, OR 319. SO I AM NOT GRANTING A REQUEST TO ORDER HIM TO STAY HERE TO TESTIFY, BECAUSE THAT WOULD BE AN AMBUSH OF AN UNDISCLOSED WITNESS ON A NEW TOPIC, UPON WHICH THERE'S NO

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

______________________________
TIFFANY SALINAS-HARWELL
CERTIFICATE NUMBER 971863

DATED: SEPTEMBER 29, 2026